# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**LEWIS BROTHERS BAKERIES, INC.,**

     **Plaintiff/Counter-Defendant,**

**v.**

**RICHARD W. BITTLE and**
**PAMELA K. BITTLE,**

     **Defendants/Counter-Plaintiffs/Third-Party Plaintiffs,**

**v.**

**OLD NATIONAL BANK,**

     **Third-Party Defendant/Counter-Defendant.**

               **Case No. 06-cv-4047-DRH**

## MEMORANDUM & ORDER

**HERNDON, Chief Judge:**

## I.  INTRODUCTION

Before the Court is third-party/counter defendant Old National Bank's ("ONB") Motion to Dismiss Third-Party Complaint (Doc. 76), filed by defendants/counter-plaintiffs/third-party plaintiffs Richard W. Bittle and Pamela K. Bittle ("the Bittles").  ONB makes its motion pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**, for failure to state a claim upon which relief can be granted. The Bittles have responded in opposition (Doc. 86) to which ONB has replied (Doc.

90).  For reasons discussed herein, the Court grants the Motion (Doc. 76) and dismisses the third party suit without prejudice.

## II. <u>FACTS</u>

Plaintiff Lewis Brothers Bakeries, Inc. ("Plaintiff" or "Lewis Bros") filed its First Amended Complaint (Doc. 5) against the Bittles on March 9, 2006.  On January 30, 2007, the Bittles filed a Third-Party Complaint (Doc. 55) against ONB. Additionally, along with their Third Amended Answer, the Bittles have filed a Second Amended Counterclaim against Lewis Bros and ONB (Doc. 113).  Construing the well-pled facts in favor of the nonmoving party, the Court derives the following factual account from the allegations in the Bittles' Third-Party Complaint.  On July 19, 1988, Illinois Hotel Group, Inc. ("IHG") executed a Promissory Note ("the IHG Note") in favor of ONB for the principle amount of $2,056,000 (Doc. 5, Ex. 1; Doc. 55, ¶ 19).  IHG was formed several years earlier, in 1985, for the purpose of constructing a hotel on land originally owned by the Bittles in Marion, Illinois (Doc. 55, ¶ 8).  The Bittles owned forty percent of IHG stock.  The majority sixty percent stock was held by William and Patricia Lewis ("the Lewises")[1] (*Id.*).  Lewis Bros is partly owned by the Lewises; along with their daughter, they own thirty percent of Lewis Bros stock (*Id.* at ¶ 9).  The majority stockholder of Lewis Bros is Jack Lewis, William's brother.  Jack Lewis is also president of Lewis Bros (*Id.*).  William Lewis, a licensed attorney, also acts as a director and an Illinois registered agent for Lewis

---

[1]  The allegations make clear that the Lewises initially owned fifty percent, but bought the remaining ten percent of IHG stock from shareholder Donald Andrus and his wife.

Bros (*Id*. at ¶ 13). Moreover, William Lewis was, or currently is, general counsel for Lewis Bros – one of his two primary clients (*Id*). Jack and William Lewis also own/control Bakery Investments, LLC (*Id*.). Jack Lewis was, or currently is, a director of ONB (*Id*. at ¶ 11). Thus, the Bittles have alleged that a symbiotic relationship exists between ONB and Lewis Bros as well between the Lewises and Lewis Bros (*Id*. at ¶¶ 15-16).

To secure the IHG Note, the Bittles executed an unconditional guaranty in the amount of $2,056,000 (Doc. 5, Ex. 2; Doc. 55, ¶ 19). This was an unsecured guaranty (Doc. 55, ¶ 19). However, the Bittles allege that it was not their guaranty that truly convinced ONB to lend the $2,056,000 to IHG, but instead, it was a secured guaranty on the IHG Note provided by the Lewises, as well as a secured guaranty by Lewis Bros for up to $500,000 of the loan amount (*Id*.). Further, the IHG Note was secured by a mortgage executed by IHG in favor of ONB, providing a mortgage lien on the real property on which the hotel (constructed by IHG) was located (*Id*. at ¶ 20).

IHG constructed a hotel on the grounds formerly owned by the Bittles in Marion, Illinois, and initially it was operated as a Shoney's Inn franchise in 1989, managed by Richard Bittle (*Id*. at ¶ 21). Because the $2,056,000 loan did not provide enough funding to both build and operate the hotel, the Lewises advanced approximately $1,900,000 as operating funds for the hotel, pledging their Lewis Bros stock as collateral (*Id*. at ¶ 26). In turn, IHG issued promissory notes to the Lewises to repay this amount, secured by second and third mortgages on the hotel's real

property (*Id.*). The Bittles allege that when IHG could not make its Note payments, Lewis Bros made payments on behalf of IHG directly to ONB (*Id.* at ¶ 27 and Ex. E). Richard Bittle continued working as hotel manager from when the hotel closed in 1999 until the spring of 2001, even though IHG could not pay him after 1999 pursuant to the terms of his management contract (*Id.* at ¶ 28). In 1991, because Shoney's Inn was continuing to decline as a supportive franchisor due to its own financial management issues, Richard Bittle began exploring other hotel franchise options, such as Hampton Inn or Holiday Inn Express, but William Lewis would not approve transferring the hotel from a Shoney's to either of these two hotel franchises because he refused to sign a personal guaranty (*Id.* at ¶¶ 32-33). However, William managed to negotiate a termination of the relationship between IHG and Shoney's Inn sometime in 1997 (*Id.* at ¶ 35).

ONB required the hotel to maintain a "brand name," so IHG subsequently entered into a franchise agreement and property improvement plan ("PIP") with Ramada Franchise Systems, Inc. ("Ramada"), to turn the Shoney's Inn into a Ramada Inn. This time, only Richard Bittle executed a personal guaranty (*Id.* at ¶¶ 36-37). The PIP required IHG to expend approximately $400,000 to get the hotel up to Ramada franchise standards. William Lewis and Lewis Bros refused to provided the necessary financing; the Bittles were unable to obtain financing otherwise (*Id.* at ¶¶ 40-41). Ramada filed suit against IHG and Richard Bittle, as personal guarantor, for breach of the franchise agreement and PIP, the Lanham Act and Richard's personal guaranty (*Id.* at ¶ 42). In February, 2004, the lawsuit

resulted in a summary judgment in favor of Ramada, holding Richard Bittle liable in the amount of $384,000 (*Id*. at ¶ 57). IHG later began to independently operate the hotel under the name Brentwood Inn & Suites sometime in 1998, but eventually closed for business during December 1999 (*Id*. at ¶¶ 43 & 48).

ONB filed suit to foreclose on its mortgage against IHG on May 14, 2001, but made no claims on any of the guaranty agreements securing the IHG Note (*Id*. at ¶ 44). The Lewises were listed as additional Defendants because they held second and third mortgages on IHG's property (*Id*.). ONB, through William Lewis, told the Bittles that it did not wish to restructure IHG's debt unless IHG filed for Chapter 11 bankruptcy (*Id*. at ¶¶ 45-46). Although the Bittles claim they did not agree with this idea, they nevertheless signed documents allowing William Lewis to become treasurer of IHG and authorizing its Chapter 11 bankruptcy proceedings (*Id*. at ¶ 47 and Ex. C). William acted as IHG's representative and debtor in possession during the entire bankruptcy proceeding (*Id*. at ¶ 54).

The Bittles allege that through August 5, 2002, the hotel owned by IHG had a fair market value exceeding its liabilities to cover the full balance owed to ONB on the IHG Note (*Id*. at ¶ 49). Richard Bittle alleges he provided William Lewis and IGH with prospective purchasers for the hotel, allegedly willing to pay $1,800,000, but that this proposal was rejected by the Chapter 11 bankruptcy trustee (*Id*.). Further, although on August 1, 2002, ONB issued a statement that the IHG Note balance was $1,563,090.18, four days later, the parties to the Debt Recasting Agreement stated that IHG owed ONB $1,895,454.99; the Bittles were not parties to

the Agreement (*Id*.).

The Lewises were listed as unsecured creditors of IHG in the amount of approximately $1,500,000, in addition to the second and third mortgages they held on the real property on which the hotel building was located (*Id*. at ¶ 52, Ex. B). The Bittles did not participate in the Chapter 11 bankruptcy proceedings other than to file claims for the amounts due to Richard Bittle under his management contract with IHG and to enforce his indemnity agreement (*Id*. at ¶ 53). However, the Bittles' claims against IHG were discharged through bankruptcy (*Id*.). William Lewis, as acting debtor in possession, ultimately reaffirmed the loan obligations of IHG to ONB (*Id*. at ¶ 55). In sum, the Bittles allege that the bankruptcy proceedings left Richard Bittle "exposed" to claims by Ramada on his personal guaranty under the Ramada franchise agreement and PIP, while removing his indemnity and reimbursement rights from IHG for these losses (*Id*. at ¶ 56).

The Bittles believe William Lewis excluded them from the Chapter 11 bankruptcy proceedings and other germane negotiations with ONB (*Id*. at ¶ 58). Yet, they claim that William Lewis expressly indicated he would negotiate with ONB in order to remove the Bittles' obligations under their Guaranty on the IHG Note, as expressed in an October 20, 2001 e-mail sent from William to Richard Bittle, stating that he met with ONB and the parties had "hammered out an agreement that will remove yours and Kay's [(Richard's wife)] obligations to the Bank, if I [(William)] can meet certain conditions" (*Id*. at ¶ 60 and Ex. D). Sometime thereafter, a "Work Out Agreement" was reached between ONB, the Lewises, Lewis Bros and other parties

affiliated with Lewis Bros (*Id*. at ¶ 62; *see also* Doc. 5, Ex. 3, p. 2, ¶ 5; Doc. 113, Ex. G). The Bittles claim William Lewis advised them of this Agreement, but failed to mention that he did not obtain ONB's release of the Bittles' obligations. The Bittles claim they were also not aware that the Lewises, Lewis Bros and ONB entered into a Debt Recasting Agreement with Hospitality Joint Venture ("HJV")[2] on August 5, 2002, until they received Plaintiff's Amended Complaint in this case (Doc. 55, ¶ 64; *see also* Doc. 5, Ex. 3).

The Debt Recasting Agreement obligated HJV to assume all of IHG's indebtedness to ONB and to pay the IHG Note to ONB. The Debt Recasting Agreement shortened the maturity date on the loan from January 1, 2014 (as stated in the IHG Note) to August 5, 2004. The Bittles allege the shortened maturity date and changed rate of interest resulted in increasing the principle amount due under the IHG Note by more than $100,000 (Doc. 55, ¶ 66). Additional security for the Debt Recasting Agreement listed: (1) a commercial guaranty from William G. Tullar, covering the entire amount of the "recast" IHG Note for $1,895,454.99, and (2) an assignment by HJV of the "Contract to Purchase Motel," entered into by IHG, as seller, and HJV, as buyer (Doc. 5, Ex. 3, pp. 1-2). The Contract to Purchase Motel required prior approval by ONB (*Id*.). These two security documents were created as "a further inducement to ONB to approve the Contract [to Purchase Motel]" (*Id*. at p. 2, ¶ 3).

---

[2] HJV is stated to be a joint venture composed of EMJ Holdings, LLC, Blue Water Investments, LLC, Lago Enterprises, LLC and Confluence Holdings, LLC, each a Missouri limited liability company.

The Debt Recasting Agreement also stated that the IHG Note was previously secured by an Unconditional Guaranty from the Lewises (the "Lewis Guaranty") and that the IHG Note and the Lewis Guaranty, in turn, were secured "by virtue of several Security Agreements (the 'Lewis Security Agreements') covering their shares in certain common capital shares of [Lewis Bros]" (Doc. 5, Ex. 3, p. 1, ¶ 3). Further, the Debt Recasting Agreement clarified that it did not "operate to release any collateral pledged to secure the IGH Note or the Lewis Guaranties. The parties hereto specifically ratify and reaffirm their obligations as set out in a certain Workout Agreement dated November 9, 2001" (Doc. 5, Ex. 3, p. 2, ¶ 5). Therefore, by the terms of the IHG Note and Debt Recasting Agreement, HJV agreed that if it defaulted on the note payments, ONB or its successors and assigns, could accelerate the Note and demand payment in full of the entire amount due from HJV or any other party acting as a guarantor of the IHG Note and/or Debt Recasting Agreement (Doc. 5, ¶ 12, Ex. 3).

On September 20, 2004, ONB and Lewis Bros entered into an Assignment Agreement whereby ONB assigned, sold and transferred all of its right, title and interest in and to the IGH Note, Debt Recasting Agreement, Commercial Guaranty and other loan documents to Lewis Bros (Doc. 5, ¶ 11, Ex. 4). This Assignment Agreement, by way of the terms of the Debt Recasting Agreement, allegedly gave Lewis Bros the right to collect on the IHG Note, and, if defaulted upon, require immediate payment in full of all amounts due from the Note's guarantors, including the Bittles (Doc. 5, ¶ 12).

HJV defaulted under the IHG Note and Debt Recasting Agreement by failing to make the required monthly payments (Doc. 5, ¶ 13). Due to the default, Lewis Bros, as assignee of ONB's rights under the IHG Note and Debt Recasting Agreement, declared the entire principal sum, together with accrued interest and late charges, immediately due and payable (Doc. 5, ¶ 14). The Bittles allege that Lewis Bros, after declaring a default by HJV on the IHG Note and Debt Recasting Agreement, sold the hotel to a new purchaser, allegedly by the name of Navarang Corporation, on June 15, 2004 for the purchase price of approximately $1,600,000 (Doc. 55, ¶ 69). Lewis Bros also subsequently filed suit in Indiana against William G. Tullar under the terms of his Commercial Guaranty of the Debt Recasting Agreement (Doc. 55, ¶ 70). Lewis Bros and Tullar allegedly settled out of court in the amount of $150,000. The Bittles contend that aside from the suit against Tullar, neither ONB nor Lewis Bros ever acted to recover any of the alleged deficiencies under the IHG Note or the secured guaranty agreements executed by the Lewises and Lewis Bros (Doc. 55, ¶ 72).

On September 27, 2004, seven days after the Assignment Agreement, Lewis Bros sent a demand letter to the Bittles. Also due to HPV's default, Lewis Bros filed suit against the Bittles (the instant action) seeking reimbursement under their Unconditional Guaranty on the IHG Note in the principle amount of $864,429.28, together with interest, late fees, court costs and attorneys' fees (Doc. 5, ¶ 15).

# III. **DISCUSSION**

## A. **Legal Standard**

Previously, when ruling on a motion to dismiss for failure to state a claim pursuant to **Rule 12(b)(6)**, the district court assumed as true all facts well-pled plus the reasonable inferences therefrom and construes them in the light most favorable to the plaintiff. ***Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) *Dist. 207*, 29 F.3d 1149, 1151 (7th Cir. 1994)**). The question was whether, under those assumptions, the plaintiff would have a right to legal relief. *Id*. This standard was articulated as such:

> [U]nder "simplified notice pleading," . . . the allegations of the complaint should be liberally construed, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

***Lewis v. Local Union No. 100 of Laborers' Int'l Union*, 750 F.2d 1368, 1373 (7th Cir. 1984)(quoting *Conley v. Gibson*, 355 U.S. 41, 46-47 (1957))**.

Earlier this year, the Seventh Circuit reiterated this liberal standard governing notice pleading:

> Rule 8 was adopted in 1938, and *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), stressed that it does not require fact pleading. It is disappointing to see a federal district judge dismiss a complaint for failure to adhere to a fact-pleading model that federal practice abrogated almost 70 years ago. As citations in the preceding paragraphs show, however, this is among many similar dispositions that the Supreme Court and this court have encountered recently and been obliged to reverse.

***Vincent v. City Colleges of Chicago*, 485 F.3d 919, 924 (7th Cir. 2007)(footnote omitted); *see also Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No.**

**84, 133 F.3d 1054, 1057 (7th Cir. 1998)**; *Kaplan v. Shure Brothers, Inc.*, **153 F.3d 413, 419 (7th Cir. 1998)**.

However, in a subsequent opinion issued on May 21, 2007, the Supreme Court determined that ***Conley's*** famous "no set of facts" phrase "ha[d] earned its retirement." ***Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1969 (May 21, 2007)**. According to the Supreme Court, the threshold pleading requirement of **FEDERAL RULE OF CIVIL PROCEDURE 8** requires a complaint allege "enough facts to state a claim to relief that is *plausible* on its face" in order to survive a **Rule 12(b)(6)** Motion to Dismiss for failure to state a claim for which relief can be granted. ***Id.* at 974 (clarifying that a "heightened fact pleading of specifics" is not required)(emphasis added)**. In other words, the Supreme Court explained it was "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'" by providing "more than labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do . . . ." ***Id.* at 1964-65 (alteration in original)(quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))**. The plaintiff must plead factual allegations which show the right to relief exists beyond mere speculation by "rais[ing] a *reasonable expectation* that discovery will reveal evidence" to substantiate the plaintiff's claims. ***Id.* at 1965**. Thus, the Seventh Circuit has interpreted ***Bell*** as imposing a two-tiered requirement for a complaint to survive a Rule 12(b)(6) motion: (1) it "must describe the claim in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests," and (2) the "allegations must plausibly suggest that the plaintiff has a right

to relief, raising the possibility above a 'speculative level.'" ***E.E.O.C. v. Concentra Health Serv., Inc.***, **496 F.3d 773, 776 (7th Cir. 2007)(citing *Bell*, ___ U.S. ___, 127 S. Ct. at 1964-65, 1973 n.14)**.

**B.      Analysis**

In their Third Party Complaint against ONB, the Bittles claim that if they are held liable under their Unconditional Guaranty for the amount due on the IHG Note to Lewis Bros, then they are entitled to indemnification or in the alternative, one hundred percent contribution of that amount from ONB because they believe IHG was the "alter ego" of both ONB and Lewis Bros (Doc. 55, ¶¶ 75 & 78).  Therefore, the Bittles allege that if IHG – the "alter ego" of ONB – was the principal obligor on the IHG Note, then ONB should also be considered the principal obligor on the IHG Note (*Id*.).  ONB now moves to dismiss the Bittles' Third Party Complaint on the grounds that it fails to state a claim for either contribution or indemnification or any other viable claim against ONB (Docs. 76 & 77).

**1.      Choice of Law**

The parties argue as to whether Indiana or Illinois law should apply to the substantive issues of the Bittles' Third Party Complaint.  The IHG Note contained a choice of law provision stating that it should be "construed in accordance with the laws of the State of Indiana" (Doc. 5, Ex. 1, p. 2).  Therefore, ONB asserts that Indiana law is applicable to any disputes arising from the IHG Note (Doc. 77, p. 3).  On the other hand, the Bittles argue that Illinois law should control the issues in this

case (Doc. 86, pp. 2-3). Because this Court sits in diversity, the Court will utilize the choice of law rules used by the forum state: Illinois. ***Midwest Grain Products of Ill. v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000)**. To determine conflict of law issues, Illinois follows the Restatement (Second) of Conflict of Laws. ***Id.* (citing *Esser v. McIntyre*, 169 Ill.2d 292, 661 N.E.2d 1138, 1141 (Ill. 1996))**. When dealing with a contractual choice of law provision, such as in this case, Illinois law will generally uphold express choice of law contractual provisions "unless it would *both* violate fundamental Illinois public policy *and* Illinois has a 'materially greater interest' in the litigation that than the chosen State." ***Maher and Assoc. v. Quality Cabinets*, 267 Ill. App. 3d 69, 76, 640 N.E.2d 1000, 1006 (Ill. App. Ct. 1994)(citation omitted)**. Illinois' public policy can be derived from "its constitution, legislative enactments and judicial decisions." ***Roanoke Agency, Inc. v. Edgar*, 101 Ill.2d 315, 327, 461 N.E.2d 1365, 1371 (Ill. 1984)(citation omitted)**. For this "public policy exception" to apply, however, the application of the contractually designated law must "yield an 'evil or repugnant result.'" ***Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 847 (7th Cir. 1999)(quoting *Lyons v. Turner Const. Co.*, 195 Ill. App. 3d 36, 41, 551 N.E.2d 1062, 1065 (Ill. App. Ct. 1990))**.

The Bittles state that they have counterclaimed against ONB for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Doc. 113).[3]

---

[3] This is actually the subject of a separate Motion to Strike Counterclaim, filed by ONB.

Further, the Bittles note that ONB filed suit to foreclose the mortgage for the hotel, constructed by IHG, under the Illinois Mortgage Act. Suit was filed where the mortgage was recorded, in Williamson County, Illinois, on May 14, 2001 (Doc. 86, p. 2). Asserting that the choice of law provision in the IHG Note does not supercede the Illinois Mortgage Act or the Illinois Consumer Fraud and Deceptive Business Practices Act, the Bittles deduce that the provision will not be applicable as the IHG Note is either "illegal" in Illinois or conflicts with Illinois public policy (*Id*. at 2-3). Additionally, the Bittles feel Illinois has a stronger interest in the outcome of this controversy as the Bittles are both Illinois citizens, IHG was an Illinois corporation, the IHG Note was to secure funds to construct a hotel in Illinois and the mortgage securing the IHG Note was recorded in Illinois (Doc. 113, ¶ 8).

The Court determines it is appropriate to apply Indiana law in determining these issues. As shown herein, Indiana law does not contravene Illinois public policy nor will its application yield "repugnant results."

**2.    Contribution and Indemnity**

In their Third Party Complaint, the Bittles, if held liable to Lewis Bros in the underlying suit, seek indemnification from ONB for such amount or, alternatively, one hundred percent contribution of such amount from ONB (Doc. 55, ¶ 78). This request for relief is based on the theory that IHG – the principle obligor on the IHG Note for which the Bittles signed an unconditional guaranty – serves as ONB's "alter ego". The Bittles also allege that IHG is the "alter ego" of Lewis Bros and thus, Lewis Bros and ONB are jointly and severally liable to the Bittles for any

of their liabilities on the IHG Note (*Id.* at ¶ 75).[4]  Specifically, the Bittles allege that IGH "became a mere instrumentality and alter ego" for ONB and Lewis Bros, during and after 1999 (*Id.*).

        **a.**     **Contribution**

               **i.**     ***Illinois Law***

In Illinois, statutory remedy for contribution embodied in the Joint Tortfeasor Contribution Act "contemplates that each party whose fault contributed to an injury should pay its *pro rata* share of the common liability."  ***Va. Sur. Co., Inc. v. Norther Ins. Co. of N.Y.*, 224 Ill.2d 550, 557, 866 N.E.2d 149, 155 (2007)(citing 740 Ill. Comp. Stat. 100/2)**.[5]  A claim of contribution solely founded upon a contract cannot be brought under the Act, as it only covers contribution actions sounding in tort.  ***N. American Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 456-57 (7th Cir. 1996)(citations omitted)**.  A common law claim of contribution arises upon a "'compulsory payment by a joint obligor of more than his share of a common obligation,'" thereby requiring the claimant to show "'he

---

[4]  The Bittles' claim for indemnity and contribution against Lewis Bros is part of their Counterclaim against Lewis Bros.

[5]  **740 Ill. Comp. Stat. 100/2** reads in pertinent part:

> (a) Except as otherwise provided in this Act, where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them.

> (b) The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is liable to make contribution beyond his own pro rata share of the common liability.

has paid more than his just proportion of the joint indebtedness and [the evidence] must also disclose what the excess is.'" *In re Rivinius, Inc.*, **977 F.2d 1171, 1175 (7th Cir. 1992)(quoting** *Ruggio v. Ditkowsky*, **147 Ill. App. 3d 638, 642, 498 N.E.2d 747, 750 (Ill. App. Ct. 1986))**.

### ii.    *Indiana Law*

Under Indiana law, "contribution involves the partial reimbursement of one who has discharged a common liability." *Mullen v. Cogdell*, **643 N.E.2d 390, 400 n.3 (Ind. Ct. App. 1994)(citing** *Coca-Cola Bottling Co. v. Vendo Co.*, **455 N.E.2d 370, 373 n.4 (Ind. Ct. App. 1983))**. Based upon equitable principles, the right of contribution stems from the understanding that each joint obligor bear the common liability in "equal proportions," the payment of such common liability being compulsory. *McLochlin v. Miller*, **217 N.E.2d 50, 53 (Ind. Ct. App. 1966)**. ONB additionally states that **INDIANA CODE § 26-1.3.1-116**,[6] provides a statutory cause of action for contribution between parties having joint and several liability on a negotiable instrument, such as a promissory note.

In comparing Indiana law with Illinois contribution law, both the

---

[6] **IND. CODE § 26-1.3.1-116** provides in pertinent part:

(a) Except as otherwise provided in the instrument, two (2) or more persons who have the same liability on an instrument as makers, drawers, acceptors, endorsers who endorse as joint payees, or anomalous endorsers are jointly and severally liable in the capacity in which they sign.

(b) Except as provided in IC 26-1-3.1-419(e) or by agreement of the affected parties, a party having joint and several liability who pays the instrument is entitled to receive from any party having the same joint and several liability contribution in accordance with applicable law.

statutory and common law essentially require joint obligors to pay their share of liability. Therefore, if one joint obligor pays more than his fair share, the other obligor is indebted to him in the amount of the overage. That a claimant may need to make a slightly different showing in order to bring a claim for contribution under the laws of one state as opposed to the other is of no consequence to this choice of law analysis, nor are the differences between the two state statutory causes of action for contribution. Indiana's contribution law does not create an outcome or place a burden upon the parties that would violate Illinois public policy.

In support of its **Rule 12(b)(6)** Motion, ONB asserts that the Third-Party Complaint fails to allege that the Bittles share a common, or joint and several, obligation with ONB for the IHG Note. Again, ONB points out that the Bittles' obligation was initially owed to ONB prior to the assignment to Lewis Bros. If anything, ONB believes that the obligation would be shared between the Bittles and Lewis Bros (Doc. 77, pp. 6-7). Instead of opposing the argument that they have failed to properly plead a claim for contribution under Illinois law, the Bittles' Response only asserts that as guarantors of the IHG Note, they are entitled to indemnity, exoneration and reimbursement from IHG, which, as the "alter ego" of ONB, thereby entitles them to seek the same from ONB (Doc. 86, pp. 3-4).

It seems apparent from the Bittles' Response and the allegations of their Third Party Complaint that they are not actually seeking contribution from ONB. Their prayer for relief seeks indemnification, or alternatively, <u>100%</u> contribution from ONB for any liability they may incur from the underlying suit filed by Lewis

Bros. Further, they have not specifically responded to ONB's contention that the Bittles fail to properly plead a claim for contribution. The Bittles' failure to address the contribution issue implies acquiescence as to ONB's argument that contribution was not properly plead. *See Wojtas v. Capital Guardian Trust Co.*, **477 F.3d 924, 926 (7th Cir. 2007) (finding that the plaintiff's failure to oppose the defendant's statute of limitation argument constituted a waiver) (citing *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) ("A failure to oppose an argument permits an inference of acquiescence and 'acquiescence operates as a waiver.'")**. Accordingly, the Bittles' have failed to properly plead a third-party claim for contribution from ONB, as it is uncertain whether the Bittles still intend to pursue it, and so it is dismissed without prejudice.

### b. Indemnification

#### i. Illinois Law

Illinois law draws a clear distinction between the legal remedies of contribution and indemnity: contribution "distributes the loss among the tortfeasors by requiring each to pay his proportionate share," whereas indemnity "shifts the entire loss from one tortfeasor who has been compelled to pay it to the shoulders of another who should bear it instead." *Va. Sur. Co., Inc.*, **224 Ill.2d at 555, 866 N.E.2d 153 (citation omitted)**. The right to bring a third-party action for indemnity can either be express or implied by law, based on quasi-contractual principles. *Schulson v. D'Ancona and Pflaum, LLC*, **354 Ill. App. 3d 572, 576, 821 N.E.2d**

**643, 647 (Ill. App. Ct. 2004);** *see also Kerschner v. Weiss & Co.*, **282 Ill. App. 3d 497, 503, 667 N.E.2d 1351, 1355-56 (1996)**. "[A] promise to indemnify will be implied by law where a blameless party is derivatively liable to the plaintiff based on the party's relationship with the one who actually caused the plaintiff's injury." *Id.* **(citing** *Kerschner*, **282 Ill. App. 3d at 503, 667 N.E.2d at 1355-56)**. Therefore, under Illinois law, a claim of implied indemnity must establish "(1) a 'pre-tort' relationship between the third-party plaintiff and the third-party defendant and (2) a qualitative distinction between the conduct of the third-party plaintiff and the third-party defendant." *Kerschner*, **282 Ill. App. 3d at 503, 667 N.E.2d at 1355-56**.

ONB cites to Illinois law describing "implied contractual indemnity" as "where 'one party's breach of contract causes a second party to breach a separate contract with a third party'" thereby allowing the second party to "shift its contractual liability to the first party" (Doc. 77, p. 5, citing *Carrillo v. Jam Prods., Ltd.*, **173 Ill. App. 3d 693, 697, 527 N.E.2d 964, 967 (Ill. 1988);** *Case Prestressing Corp. v. Chicago College of Osteopathic Med.*, **118 Ill. App. 3d 782, 788, 455 N.E.2d 811, 816 (Ill. App. Ct. 1983)**).

### ii.    Indiana Law

ONB notes that Indiana law only recognizes a claim for implied indemnity at common law in the context of derivative or constructive liability (Doc. 77, p. 7, citing *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.*, **578**

**N.E.2d 669, 671 (Ind. 1991)**).  Absent an express contract to indemnify, implied indemnity must result from the wrongful act which thus causes the "derivative or constructive liability to be imposed upon the indemnitee." ***Id.***  Additionally, the party seeking indemnification "must be free of fault." ***Id.***  As supportive authority, ONB also cites to ***Ball v. Versar, Inc.*, 2002 WL 31045357 at * 11 (S.D. Ind. Sept. 6, 2002)** and ***In re Lawrence W. Inlow Accident Litigation*, 2001 WL 331625 at * 10 (S.D. Ind. Feb. 7, 2001)**.

Again, using Illinois choice of law principles, the Court does not find that Indiana indemnity law violates Illinois public policy.  Both Indiana and Illinois indemnity law seeks to shift liability to the party bearing fault, rather than the party who bears the burden of the liability due to some pre-existing relationship.  Thus, the Court will apply Indiana law pursuant to the choice of law provision found in the guaranty signed by the Bittles.

Here, ONB believes the Bittles' claim for indemnity to be contractually based, due to their guaranty, instead of tort-based.  Therefore, ONB asserts such a claim cannot survive under Indiana law.  Secondly, ONB argues that because the Bittles had an independent duty to make payments to ONB via the terms of their personal guaranty, this, too, is reason why such claim fails under Indiana law (Doc. 77, pp. 7-8).  However, as the Bittles correctly assert in their Response, under both Illinois and Indiana law, a guarantor who pays on a note is thereby subrogated to all rights and remedies of the holder of the note (or creditor).  ***In re Doctors Hosp. of***

*Hyde Park, Inc.*, 474 F.3d 421, 427 (7th Cir. 2007)(citing *Weissman v. Weener*, 12 F.3d 84, 87 (7th Cir. 1993)); *Colonial Penn Life Ins. Co, v. Hallmark Ins. Adm'rs, Inc.*, 31 F.3d 445, 447 n.1 (7th Cir. 1994)(citing 83 C.J.S. *Subrogation* § 59 (1953); *Holyoke v. Continental Ill. Nat'l Bank & Trust Co.*, 346 Ill. App. 284, 297, 104 N.E.2d 838, 843 (1952)); *Brown v. State Farm & Casualty Co.*, 33 Ill. App. 3d 889, 894, 338 N.E.2d 427, 430 (Ill. App. Ct. 1975); *Auburn Cordage, Inc. v. Revocable Trust Agreement of Treadwell*, 848 N.E.2d 738, 749 (Ind. Ct. App. 2006)(citing 38 AM. JUR. 2D *Guaranty* § 120 (1999)); *Ind. Univ. v. Ind. Bonding & Sur. Co.*, 416 N.E.2d 1275, 1284 (Ind. Ct. App. 1981)(citing *Ertel v. Radio Corp. of America*, 307 N.E.2d 471, 474 (Ind. Ct. App. 1974)).

The Bittles allegedly guaranteed the IHG Note to ONB; the IHG Note was subsequently assigned to Lewis Bros. If the Bittles are held liable on the guaranty in the underlying suit brought by Lewis Bros, they argue that they should have the subrogation rights of the lender against the principal obligor, IHG. The Bittles' theory is that ONB and Lewis Bros "so dominated and controlled the affairs of the principal borrower, IHG, that IHG was their alter ego" (Doc. 86, p. 3). Therefore, their subrogation rights, they believe, allow them to seek indemnification not only from IHG, but as it is the alleged "alter ego" of ONB, they should also be able to file a third-party claim for indemnification against ONB. The Bittles contend that ONB has not properly shown that the third-party allegations fail to plead facts sufficient

to establish the "alter ego" relationship between IHG and ONB. Examining the law behind this alter ego theory will allow the Court to determine whether a third-party claim for indemnification based upon the Bittles' rights as guarantors of the IHG Note can be brought against ONB.

### c. Alter Ego

#### i. Illinois Law

In Illinois, the alter ego doctrine allows the corporate veil to be pierced when an individual "uses a corporation merely as an instrumentality to conduct his or her own personal business, and such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation." *Semande v. Estes*, **374 Ill. App. 3d 468, 471, 871 N.E.2d 268, 271 (Ill. App. Ct. 2007)(citing *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill.2d 166, 173, 632 N.E.2d 1015, 1018 (1994); *Sinquefield v. Sears Roebuck and Co.*, 209 Ill. App.3 d 595, 598, 568 N.E.2d 325, 327 (1991)).** In other words, when the corporation serves as a mere "alter ego" or "business conduit of another dominating personality," including another corporate entity. *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, **371 Ill. App. 3d 1019, 1033, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007)**.

Illinois courts, however, are reluctant to pierce the corporate veil and will only do so upon a showing that "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no

longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." ***Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 840 N.E.2d 767 (Ill. App. Ct. 2005)(citing *People ex rel. Scott v. Pintozzi*, 50 Ill.2d 115, 128-29, 277 N.E.2d 844, 851-52 (1971); *In re Estate of Wallen*, 262 Ill. App. 3d 61, 68-9, 633 N.E.2d 1350, 1357-58 (Ill. App. Ct. 1994)); *see also Great Lakes Overseas, Inc. v. Wah Kwong Shipping Group, Ltd.*, 990 F.2d 990, 996 (7th Cir. 1993)**. Factors considered when determining whether there is "unity of interest and ownership" include: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders." ***Fontana*, 362 Ill. App. 3d at 503, 840 N.E.2d at 778 (citing *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 1088, 664 N.E.2d 328, 331 (Ill. App. Ct. 1996); *Estate of Wallen*, 262 Ill. App. 3d at 69, 633 N.E.2d at 1357-58)**. To determine whether circumstances "exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote

inequitable consequences," Illinois courts do not require a finding of actual fraud, but the facts must prove the existence of "[s]ome element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest." ***Id.*, 362 Ill. App. 3d at 507, 840 N.E.2d at 781-82 (alteration in original)(citing Berlinger's, Inc. v. Beef's Finest, Inc., 57 Ill. App. 3d 319, 324, 372 N.E.2d 1043, 1048 (Ill. App. Ct. 1978); Wallen, 262 Ill. App. 3d at 68-69, 633 N.E.2d 1350, 1357; Central States, Southeast & Southwest Areas Pension Fund v. Gaylur Products, Inc., 66 Ill. App. 3d 709, 715, 384 N.E.2d 123, 127 (1978)).***

### ii.    Indiana Law

Under Indiana law, "the corporate alter ego doctrine is a device by which a plaintiff tries to show that two corporations are so closely connected that the plaintiff should be able to sue one for the actions of the other." ***Greater Hammond Community Serv., Inc. v. Mutka*, 735 N.E.2d 780, 785 (Ind. 2000).**  Much like in Illinois, courts in Indiana are reluctant to pierce the corporate veil but will do so "to prevent fraud or unfairness to third parties." ***Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188, 1191 (Ind. Ct. App. 2002)(citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1232 (Ind. 1994)).**  If a plaintiff alleges a corporation is merely an "alter ego" for another entity, he or she has the burden of showing "'that the corporation was so ignored, controlled or manipulated that it was merely the instrumentality of another, and that the misuse of the corporate form would constitute a fraud or promote injustice.'" ***Winkler*, 638 N.E.2d at 1232**

**(citing *Gurnik v. Lee*, 587 N.E.2d 706, 710 (Ind. Ct. App. 1992))**.

Describing this inquiry as "highly fact sensitive," ***see id.* at 1232 (citing *Hinds v. McNair*, 129 N.E.2d 553, 559-61 (Ind. 1955))**, the Indiana Supreme Court considers the following factors when determining whether to pierce the corporate veil: "(1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form." ***Oliver*, 769 N.E.2d at 1192 (quoting *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994))**. Additional veil-piercing factors included in a court's analysis when a plaintiff seeks to hold one corporate liable for the debt accrued by another closed related corporation are: "(1) similar corporate names were used; (2) the corporations shared common principal corporate officers, directors, and employees; (3) the business purposes of the corporations were similar; and (4) the corporations were located in the same offices and used the same telephone numbers and business cards." ***Id.* (citing *Smith v. McLeod Distributing, Inc.*, 744 N.E.2d 459, 463 (Ind. Ct. App.2000))**.

Indiana law regarding whether a corporate entity is considered the "alter ego" of another corporate entity is nearly identical to Illinois law. Thus, there is no

violation of Illinois public policy.  Accordingly, the Court will apply Indiana law in determining whether the Bittles' have adequately plead that IHG was the alter ego of ONB to support their third-party claim for indemnity.

The Bittles have alleged in their Third-Party Complaint that ONB and Lewis Bros "so dominated, controlled and intermingled their financial resources with those of [IHG] that [IHG] became a mere instrumentality and alter ego for [Lewis Bros] and/or [ONB] during, and after 1999, when [IHG] was a corporation in name only and existed solely as an instrument and alter ego for [Lewis Bros] and [ONB]" (Doc. 55, ¶ 75).[7]  It is clear the Bittles have used appropriate terms of art in alleging their alter ego theory, yet the pleadings do not demonstrate any of the factors ultimately considered by the Court in its veil-piercing analysis.  The Court, therefore, does not believe the standards set forth in ***Bell*** allow the claim to survive as currently alleged – which must serve to raise the possibility above a "speculative level" that IHG served as the alter ego of ONB and Lewis Bros.  It follows that without the "alter ego" theory, the Bittles cannot state a third-party claim of indemnification against ONB, and so it must be dismissed without prejudice.

---

[7]  The names are bracketed because the Bittles use different abbreviations for the parties: IHG is called "Hotel," Lewis Bros is called "Bakery" and ONB is called "Bank."

## IV.  CONCLUSION

The Court hereby **GRANTS** ONB's Motion to Dismiss Third-Party Complaint (Doc. 76).  The Bittles' Third-Party Complaint (Doc. 55) is accordingly **DISMISSED WITHOUT PREJUDICE,** allowing leave to file an amended third-party complaint in order to correct the pleading deficiencies as discussed in this Order. The Bittles shall file their amended third-party complaint, if they so elect, by Monday, January 21, 2008.


**IT IS SO ORDERED.**

Signed this 17th day of December, 2007.


/s/      *David R Herndon*

**Chief Judge**
**United States District Court**